IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:23-cv-180-D-RN

|  |  |  |
|---|---|---|
| | : | |
| ESTATE OF JADA JOHNSON, L.L., | : | |
| the minor daughter of Jada Johnson, | : | |
| RICHARD IWANSKI, individually, as | : | |
| Executor of the Estate of Jada Johnson | : | |
| and guardian of L.J., and MARIA | : | **DEFENDANT RUGG'S MEMORANDUM** |
| IWANSKI, individually, as executor | : | **OF LAW IN SUPPORT OF MOTION FOR** |
| of the Estate of Jada Johnson and | : | **SUMMARY JUDGMENT** |
| guardian of L.J. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SERGEANT TIMOTHY RUGG, | : | |
| individually, OFFICER ZACHARIUS | : | |
| BOROM, individually, JOHN AND | : | |
| JANE DOES 1-100, City of | : | |
| Fayetteville employees and police | : | |
| officers, | : | |
| | : | |
| Defendants. | : | |

Defendant Sergeant Timothy Rugg ("Sergeant Rugg") in his individual capacity submits

the following memorandum of facts and law in support of his Motion for Summary Judgment.

## STATEMENT OF THE CASE

Plaintiffs filed their Complaint, naming the City of Fayetteville, Sergeant Rugg, Officer

Borom and John and Jane Does 1-100 on April 7, 2023 [DE #1]. On June 26 2023, Plaintiffs filed

a 1st Amended Complaint asserting excessive force claims in violation of 42 U.S.C §1983,

wrongful death, survivorship, intentional infliction of emotional distress, negligent infliction of

1

emotional distress, negligent execution of official duties, assault, battery, and, against Fayetteville only, negligent hiring, training and supervision [DE #26]. Fayetteville moved to dismiss the Amended Complaint on June 28, 2023 [DE #29]. On that same day, Fayetteville moved to stay discovery and other proceedings pending resolution of the Motion to Dismiss [DE #31]. Sergeant Rugg and Officer Borom filed their answers to the Amended Complaint on July 17, 2023 [DE #33, DE #39]. Plaintiffs responded to Fayetteville's Motion to Dismiss and Motion to Stay on July 17, 2023 [DE #35, #37]. Fayetteville replied to the response of the Plaintiffs on July 31, 2023 [DE #40]. This matter was stayed pending resolution of the Motion to Dismiss by Order entered August 2, 2023 [DE #43].

By Order dated December 1, 2023, this Court dismissed the claims made against Fayetteville, lifted the discovery stay and ordered the remaining parties to confer and file a discovery plan [DE #46]. The parties thereafter engaged in discovery and presented various protective orders relative to discovery matters, the final deadline for completion of discovery was May 30, 2025 and the dispositive motions deadline was set for July 7, 2025 [DE #65, 77]. Plaintiffs filed a motion for partial summary judgment on May 23, 2025 [DE #78]. The matter is before the Court on Defendant Rugg's motion for summary judgment.

<u>**BRIEF SUMMARY OF THE EVENT**</u>

This case involves the tragic shooting of an armed, delusional young woman in her home on July 1, 2022. Officers responded to multiple 911 calls concerning a home break-in. When they discovered the calls were baseless, two officers waited in the home with the young woman for EMS to take her to the hospital for mental health treatment. She pulled a gun. She refused to put the gun down. After at least 30 minutes of trying to talk the woman down, one officer (Rugg) tried to disarm her. She struggled for the gun and she and the officer fell. As they struggled, the other

2

officer (Borum) approached and fired his weapon to stop the woman from regaining control the gun. She fell to the ground, the gun landed inches away from her. Both officers withdrew and re-assessed. The woman grabbed the gun. When the officer on the ground grabbed the woman's hand, again trying to get the gun from her, the other officer approached fired his weapon again. The woman died.

## STATEMENT OF UNDISPUTED FACTS

On the evening of July 1, 2022, some time after 9:00 pm, Officers from the Fayetteville Police Department ("FPD") were dispatched to 2308 Colgate Drive, Fayetteville, North Carolina, in response to multiple 911 calls from the home (Rugg Deposition pp. 43-44; Borom Deposition pg. 35-36).[1] The caller reported that four people had kicked the back door open and were inside the home, and that there was a child who was not breathing (Rugg depo. p. 29; Rugg Camera 1 5:05; Borom depo. pp. 35-36). FPD Officer Jordan Sori and Officer (now Sergeant) Zacharius Borom initially responded (Borom depo. pp. 38-39). Officer Sori was accompanied by an intern ride along (*Id.*)

Plaintiffs Richard and Maria Iwanski met the officers at the front porch doorway area of Mr. Iwanski's home (Borom Deposition pg. 38). Inside the residence, the officers and the intern encountered Jada Johnson and her "baby girl" (" L.J.") (Borom depo. pp. 41 and 42).

After observing the occupants of the home to confirm that there were no unconscious subjects as had been reported, Officer Borom spoke to Mr. Iwanski and they proceeded to a laundry/utility room toward the rear of the residence to check the back door (Borom Deposition

---

[1] With the exception of his CV, filed as Exhibit R with this Memorandum, Sgt. Rugg references body camera footage, deposition transcripts (with exhibits) and expert reports filed by co-defendant Zacharias Borom.

3

pp. 42-43; Borom Camera 1 2:19). Mr. Iwanski confirmed, "I personally haven't seen anything" to validate the reports of home invasion or unconscious persons and described his granddaughter Ms. Johnson as "very combative, she's very defensive" (Borom Camera 1 3:20). Sergeant Borom asked Mr. Iwanski if his granddaughter had been diagnosed with any condition and Mr. Iwanski replied, "no." (Borom Camera 1 3:43).

Mr. Iwanski thereafter stated that "she's got paranoia, schizophrenia." Sergeant Borom suggested that, if true, Ms. Johnson likely needed involuntary commitment to address her mental health needs (Borom Camera 1 5:01). Sergeant Borom explained the significance of the repeated 911 calls to Mr. Iwanski, explaining "once she keeps calling, they will take her to jail." (Borom Camera 1 5:40). Sergeant Borom checked the back door and confirmed no signs of home invasion and thereafter returned to the living room area of the home as Sergeant Rugg arrived.

Sergeant Rugg was, on July 1, 2022, the patrol sergeant over Central D Squad for the Fayetteville Police Department (Rugg Deposition pg. 12). Rugg had approximately 17 years' experience as a law enforcement officer, including 13 years of service to the Hoke County Sheriff's Office. (Rugg Deposition pp. 7-10). He had advanced to the rank of sergeant in two years of beginning his service to FPD (Rugg Deposition pg. 11). At the time of the incident, Sergeant Rugg had a long and impressive record of training, described his training in his deposition between pages 13-15. His CV is attached as Exhibit R.

Sergeant Rugg had observed the call for officers to respond on the computer screen in his patrol vehicle and noticed that the call reported either a home invasion or something in progress, and that there had been multiple telephone calls reporting it. (Rugg depo. p. 43). Simultaneously, Sergeant Rugg received a request by radio to call dispatch, who instructed to proceed to the Iwanski

4

residence because a female had called 911 at least 12 times and kept changing her story (Rugg depo. p. 44). Rugg arrived just before 10:00 pm (Rugg deposition pp. 29-30).

As Rugg arrived at the Iwanski residence, fire and ambulance vehicles were leaving. (Rugg depo. pg. 30). He entered the home where he saw Officer Borom, Officer Sori and the intern ride-along inside the home. Shortly thereafter, Sergeant Rugg went with Mr. Iwanski to the back door area where Iwanski had previously taken Sergeant Borom. There, Mr. Iwanski confirmed that the doorbell camera did not show anyone kicking, attempting to enter or around the back door (Rugg Camera 1 14:15). Sergeant Rugg explained the purpose of his dispatch was to investigate the misuse of 911 because the 911 calls made statements that were untrue (Rugg Camera 1 16:38). In this conversation, Mr. Iwanski described his granddaughter as experiencing "paranoid schizophrenia," admitted that he did not believe there was any attempt to break in the home and advised that Ms. Johnson had been committed to the Cape Fear Valley Hospital two days earlier.

After speaking with Mr. Iwanski by the back door, Sergeant Rugg returned to the living room where Sergeant Borom and Officer Sori were present with the adults and the child (Rugg Deposition pg. 47). Sergeant Rugg stated that he knew Johnson had been previously hospitalized and asked about any diagnosis (Rugg Deposition pg. 48). Mrs. Iwanski responded that Ms. Johnson did not have any mental disorders, "anxiety only." (Borom Camera 1 20:35).

The decedent, Ms. Johnson, told the officers she never wanted to call 911, that she wanted to have a "shootout" and that she was "ready to die in front of her daughter," (Borom Camera 1 23:23). Officer Sori again advised Ms. Johnson about a restraining order (Borom Camera 1 23:56). Rugg questioned Ms. Johnson about whether she had ever been diagnosed with schizophrenia, which she denied. Sergeant Rugg then instructed Ms. Johnson to speak with another person in the

5

home before calling 911 again and attempted to explain the seriousness of misusing 911 (Borom Camera 1 25:20-26:56). With no prompting, Johnson thereafter requested to be "readmitted" to the hospital (Borom Camera 1 27:20). Johnson requested that the police transport her to the hospital, Officer Sori explained that was not possible and Sergeant Borom radioed to request that EMS return to the Iwanski residence (Borom Camera 1 28:04).

Sergeant Rugg thereafter stepped outside with Sergeant Borom where they discussed matters (Borom Camera 1 26:17). Shortly thereafter Ms. Johnson came to the front door of the home and demanded that the officers come back into the house. The two officers entered, and Johnson locked the door behind them (Rugg Camera 2 0:52). Once inside the home, the officers continued to try to reassure Ms. Johnson as they waited for the ambulance to arrive and take her to the hospital (Rugg Camera 2 6:21).

Sergeant Rugg requested Ms. Johnson stop locking the front door with the police officers inside (Rugg Camera 2 15:30). Sergeant Rugg believed that Ms. Johnson was possibly experiencing a psychiatric incident or situation but saw no reason to request intervention from someone trained in crisis intervention training because he knew there was an ambulance en route soon and there was no crisis at that time (Rugg Deposition pp. 80-81). Officer Sori had, by this time, left the residence with the intern.

Ms. Johnson thereafter approached the front door of the home and, looking out the window, requested Mrs. Iwanski call the police. Mrs. Iwanski refused, explaining that the police were in the home (Rugg Camera 2 16:50: Rugg Deposition pg. 68). Rugg responded in a stern manner, saying "this is the kind of crap that is gonna get you in jail; you don't call the police when the police are standing in your living room," (Rugg Camera 2 16:59; Rugg Deposition pp. 68-68). Rugg admittedly talks louder than normal and had seen Mr. Iwanski be stern with Johnson a few

6

times earlier with success, so he used a stern tone attempting to redirect her train of thought (Rugg Deposition pp. 72, 73 and 76).

Ms. Johnson pulled a handgun from the waistband of her pants and held it to her head, announcing that she was going to kill herself (Rugg Camera 2 17:14). Rugg was in the foyer near the front door at the time (Rugg Deposition pg. 67). Sergeant Borom told Ms. Johnson to put the gun down (Rugg Camera 2 17:21).

Shortly thereafter, Johnson kind of exhaled, dropped the gun to her side and slid down the wall by the stairs in the foyer to a squatting position, placing the gun on the floor with her hand hovering just above it (Rugg Camera 2 18:03; Rugg Deposition pg. 71). Sergeant Borom told Ms. Johnson that he needed her to stand up (Rugg Camera 2 18:10). Ms. Johnson continued to ask Mrs. Iwanski to call the police. Mrs. Iwanski approached Ms. Johnson, saying that Mr. Iwanski had called. Ms. Johnson retrieved the gun from the floor and again pointed it at her head (Rugg Camera 2 18:33). Sergeant Borom directed Mrs. Iwanski to back away from Ms. Johnson (Id.).

Ms. Johnson stood up to look out the window at the front door of the home (Rugg Camera 2 18:40). Sergeant Borom told Ms. Johnson "I need you to put that gun down," (Rugg Camera 2 18:54). Sergeant Borom again asked, "can you put that down for me?" (Rugg Camera 2 19:02)

Johnson said "gimme my baby," demanding that L.J. be brought to her (Rugg Camera 2 19:10). Sergeant Borom responded "we can't do that," and Sergeant Rugg stated, "we can do that if you put [the gun] down." (Id.). Ms. Johnson insisted that her grandmother bring L.J. to her (Rugg Camera 2 19:39). Sergeant Borom told Ms. Johnson "We can get you out of here but you'll have to drop that, okay?" (Id.). Mrs. Iwanski approached Johnson with L.J. in her arms (Rugg Camera 2 20:00). Johnson grabbed for L.J. and pulled both the child and Mrs. Iwanski in between her and

7

Sergeant Rugg (Id). Sergeant Borom asked Johnson to let L.J. go watch cartoons, but Johnson held Mrs. Iwanski by the arm refusing to let her take the child away (Rugg Camera 2 20:22).

Ms. Johnson ordered Sergeant Rugg to move away from the front door of the home and Sergeant Rugg responded that he would follow her. Johnson moved to a chair further inside the home with Mrs. Iwanski close beside her holding the child, Sergeant Rugg a few feet away to her left and Sergeant Borom a few feet to her right (Rugg Camera 2 21:04). By this time, EMS had arrived (Rugg Deposition pg. 88).

Sergeant Borom asked Ms. Johnson to give the gun to her grandmother (Rugg Camera 2 21:23). Mr. Iwanski asked Ms. Johnson "could you give him that weapon?" and Johnson refused (Rugg Camera 2 21:31). Sergeant Borom asked Ms. Johnson to let L.J. go to bed and she refused. Johnson asked for a drink that she had apparently been consuming before the officers arrived (Rugg Deposition pg. 89). Sergeant Borom told Johnson that the ambulance had arrived, and Sergeant Rugg radioed asking EMS to stand by (Rugg Camera 2 23:35).

Camera footage depicts Ms. Johnson thereafter standing from the chair and pulling Mrs. Iwanski further into the interior of the home where she stopped with her back to an interior wall near its corner that turned toward the dining room, holding Mrs. Iwanski by the arm as Sergeant Rugg turned and moved to stay near them (Rugg Camera 2 24:03; Rugg Deposition pg. 97).

Sergeant Borom asked if Ms. Johnson wanted EMS to enter the home and Ms. Johnson claimed it was "not them," asking Mr. Iwanski to check the front doorbell camera (Rugg Camera 2 24:42). Mr. Iwanski advised that he could see the ambulance and showed his phone to Ms. Johnson who asked why EMS had not come to the door. Sergeant Rugg explained that EMS could not enter the home while she was holding the gun. He told her that, if she put the gun down, EMS

8

would come in. Ms. Johnson did not put the gun down (Rugg Camera 2 25:50). Mr. Iwanski announced that EMS was approaching the door, Sergeant Rugg again radioed for EMS to stand by, and Ms. Johnson yelled "do not open the door." Sergeant Borom instructed that the door not be opened (Rugg Camera 2 26:11).

As Ms. Johnson stood with her back to the interior wall of the Iwanski home, at its corner with the dining area, Sergeant Borom continued to advise that he was there to help and asked what he could do. Sergeant Borom asked Ms. Johnson to allow the baby L.J. to go back to bed and Ms. Johnson refused (Rugg Camera 2 29:30). Johnson, with the gun remaining in her right hand and holding Mrs. Iwanski's arm with her left hand, demanded that Mr. Iwanski bring a cell phone and dial it for her (Rugg Camera 2 30:14). Johnson remained in the area at the corner of the interior wall, refusing requests from Sergeant Borom to allow L.J. to go lie down and ultimately taking a phone dialed by Mrs. Iwanski and speaking with the ex-boyfriend Mr. Britton-Watson holding the phone in her left hand while she was still holding the gun in her right hand (Rugg Camera 2 31:03-33:03). Efforts by the Iwanskis to remove the child from the immediate presence of Johnson were refused by Johnson as she was on the phone (Rugg Camera 2 32:16-36-47)

Johnson eventually spoke on the phone about obtaining fentanyl so she could "die in front of her family" (Rugg Camera 2 42:09). Johnson then ordered Mr. Iwanski to "get the fucking pills" (Rugg Camera 2 43:07). Sergeant Borom advised Johnson that the gun, at this point resting on a small table, was pointed at Sergeant Rugg (Rugg Camera 2 43:43; Rugg Deposition pg 117).

When Mr. Iwanski returned with a pill bottle, Johnson placed the cell phone between her left shoulder and ear and reached with her left hand for the pill bottle, thereafter placing the gun under her left armpit so she could use her right hand to open the pill bottle (Borom Camera 2 27:22). Rugg was hoping for an opportunity to disarm Johnson when the pill bottle was presented

9

to her (Rugg Deposition pp. 101, 102, 105). Rugg then reached across Johnson to try and gain possession of the gun under Johnson's armpit; in so doing he placed his body between Johnson and Mrs. Iwanski who was still holding L.J. (Borom Camera 2 27:32; Rugg Deposition pg. 106). Rugg and Johnson fell to the floor as they struggled for the gun (Rugg Camera 2 44:03; Rugg Deposition pg. 107).

Sergeant Borom unholstered his service weapon and approached. The gun cannot be seen in Sergeant Borom's body camera video at this time (Borom Camera 2 27:36). As Sergeant Rugg struggled with Johnson for the gun, Sergeant Borom yelled "shot" and fired a volley of seven shots in approximately 2 seconds (Borom Camera 2 27:36). Sergeant Borom immediately radioed for assistance from EMS (Borom Camera 2 27:42).

After the shots, Sergeant Rugg went to a kneeling position and looked back at Ms. Johnson lying on the floor on her left side with her back to the interior wall of the adjoining dining room (Rugg deposition pg 111). Johnson revived, reached for and grabbed the gun with her right hand as Sergeant Rugg reached in to grab the gun himself (Rugg Camera 2 44:12; Borom Camera 2 27:44; Rugg Deposition pp. 111-112). Rugg confirmed, in his deposition at page 115, that Johnson "was looking down where that firearm was in that general area and was reaching forward with her hand…" when he moved back to prevent her from possessing the weapon.

As Sergeant Rugg moved to take possession of the gun on the floor, Sergeant Borom re-engaged, firing a second volley of nine shots in a period of approximately 3 seconds (Borom Camera 2 27:44-27:47). Sergeant Rugg struggled to his feet and reported the shots fired over his radio (Rugg Camera 2 44:22). Sergeant Borom opened the front door to allow EMS access, secured Johnson's hands behind her back and attempted to render aid until replaced by EMS workers

10

(Borom Camera 2 27:48-29:42). Emergency measures were unsuccessful, and Jada Johnson was later pronounced dead at the scene.

After the incident, it was determined that the gun possessed by Jada Johnson on the night of the fatal event was owned by Shantel Evette Jones McNeill (Maria Iwanski Deposition, Exhibit 8). Neither of the Iwanskis claimed knowledge of the gun, its origin or how Johnson had the gun in Mr. Iwanski's home. (Maria Iwanski Deposition, pp. 115-117); Richard Iwanski Deposition, pg. 278) Court records reflect that Ms. Johnson had a history of criminal activity, including a charge related to shooting a gun at a female in a Fayetteville area convenience store (Maria Iwanski Deposition, Exhibit 3).

A post-mortem toxicology report, performed by the North Carolina Office of Chief Medical Examiner in conjunction with an investigation performed by the State Bureau of Investigation, revealed that, at the time of her death, Johnson had an ethanol level of 150mg/dL recovered from her urinary bladder, and an amphetamine level of 0.012mg/L, an ethanol level of 120mg% and a methamphetamine level of 0.32mg/L in blood drawn from other parts of her body (Maria Iwanski Deposition Exhibit 7). It was also subsequently discovered, through the records of Cape Fear Memorial Hospital, that during the previous hospital admission from which Ms. Johnson had been discharged on the morning of the fatal incident, records reflected a history of "drinking heavily" and blood tests were positive for cocaine, amphetamine and alcohol with a primary diagnosis assessment stating patient's symptoms appear to be "substance induced psychosis" (Maria Iwanski Deposition pp. 154, 179; Exhibit 6). The Cape Fear records included discharge paperwork that were on a bedroom dresser in the Iwanski house at all times relevant to the matters involved in this case. (Maria Iwanski Deposition p. 169). Those discharge instructions, at the bottom of page 22 and onto page 23 include instructions advising "do not use any drugs or ETOH" and included

11

contact information, mobile crisis and mental health with instructions to call in the event of a mental health crisis (Maria Iwanski Deposition Exhibit 5). Maria Iwanski admitted in her deposition that neither she nor her husband complied with the hospital instructions and contacted the hospital regarding the mental health crisis.

It was also subsequently discovered that, on June 28, 2024, Mr. and Mrs. Iwanski, in their capacity as administrators of the Estate of the late Jada Johnson filed suit against Scott Michael Klenzak, M.D., Pinecone Clinic, PLLC and Cumberland County Hospital System, Inc. d/b/a Cape Fear Valley Health System in the Superior Court of Cumberland County, North Carolina (Maria Iwanski Deposition Exhibit 6). In that Complaint, it was alleged that the late Jada Johnson was involuntarily committed on June 30, 2022 at approximately 8:04 am, that the late Ms. Johnson admitted to substance abuse of alcohol, cocaine and mixed substances, that Johnson was discharged on the morning of July 1, 2022, that Johnson had been talking with her grandparents about death and how she could not escape death beginning at approximately 1 pm on that day and that deficiencies in her assessment, care and discharge were "the proximate cause of her subsequent death" (Maria Iwanski Deposition Exhibit 6).

## **ARGUMENT**

**I.    PLAINTIFF'S § 1983 EXCESSIVE FORCE CLAIM SHOULD BE DISMISSED BECAUSE SERGEANT RUGG'S ATTEMPT TO DISARM JOHNSON WAS NOT AN OBJECTIVELY UNREASONABLE USE OF FORCE.**

Sergeant Rugg did not use excessive force when he attempted to disarm a delusional, erratic suspect during a fast-moving, escalating situation. A claim of excessive force by a law enforcement officer implicates the constitutional rights of an individual to be free from unreasonable search and seizure under the Fourth Amendment. *Elliott v. Leavitt,* 99 F.3d 640, 643 (4th Cir. 1996). To determine whether the alleged police conduct constitutes excessive force, the court applies an

12

objective standard of reasonableness, based on the totality of the circumstances. *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025); *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also Elliott,* 99 F.3d at 642 (4th Cir. 1996) ("The court's focus should be … on the fact that officers on the beat are not often afforded the luxury of armchair reflection.") Specifically, a court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell,* 247 F.3d 125, 129 (4th Cir. 2001) (*citing Graham,* 490 U.S. at 395).

In this case, Sgt. Rugg's use of force—struggling with an armed suspect in an attempt to take her firearm—was not objectively excessive or otherwise unreasonable. In fact, Rugg used no physical force at all until attempting to take possession of the gun from Johnson at an opportune moment. There is no case law establishing that an attempt to disarm a suspect by grabbing her firearm, or by wrestling the suspect to the ground, was objectively excessive force under circumstances such as this. Plaintiffs' contentions that Sergeant Rugg may have had other— perhaps even better--opportunities to remove the gun from Johnson's possession, are simply "armchair reflection" that is not appropriate. It is well-established law that so long as the officer's course of action is a reasonable one, it is irrelevant whether there are "better" or "more reasonable" alternatives. *See, e.g., Raub v. Campbell*, 785 F.3d 876, 884 & n.7 (4th Cir. 2015) (noting that relevant inquiry is whether officer's actions were a reasonable response, not whether "another reasonable, or more reasonable" alternatives could have been chosen); *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (holding that circuit court erred by focusing on availability of "another reasonable, or more reasonable" alternative). The camera evidence in this case, coupled with the testimony of Sergeant Rugg and Officer Borom, fully supports the conclusion that the officers reasonably concluded that a threat existed to justify attempting to disarm Ms. Johnson.

Plaintiffs' theory seems to be that Sergeant Rugg's efforts to disarm Ms. Johnson somehow make him responsible for the gunshots fired by Sergeant Borom. This theory is also plainly erroneous. There is no evidence that Rugg and Borom conferred together to act on some plan to attempt to gain control of the weapon brandished by Ms. Johnson and then to shoot her if she resisted. Instead, Rugg independently perceived an opportunity and acted at a moment when he reasonably believed he could take possession of the gun. Plaintiffs' decedent resisted the attempt to disarm her and Officer Borom perceived it necessary to discharge his duty weapon in protection of Sergeant Rugg, who was struggling with a resistant Johnson for the gun. Officer Borum's decision to discharge his weapon was a reasonable one, but it is also entirely irrelevant to the question of Rugg's liability, because Rugg's liability depends solely on whether his own actions "violated the Constitution." *See, e.g., King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023) ("Put differently, each Government official . . . is only liable for his or her own misconduct."); *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). "Liability is thus determined person by person: a plaintiff must show 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *King*, 76 F.4th at 269.

Based on the foregoing arguments and authorities, the law requires that Plaintiffs' § 1983 excessive force claim should be dismissed because the undisputed facts show that Sergeant Rugg acted reasonably as a matter of law.

## II. QUALIFIED IMMUNITY BARS THE § 1983 CLAIM AGAINST SERGEANT RUGG IN HIS INDIVIDUAL CAPACITY.

Sergeant Rugg is entitled to summary judgment on the § 1983 claim because the force he used was negligible and was <u>not</u> objectively unreasonable under the circumstances. However, should the Court conclude that there is some triable issue of fact as to whether Plaintiff's rights were violated, Defendants contend that Sergeant Rugg is nevertheless entitled to qualified

14

immunity because, under the circumstances of this case, Rugg's actions did not violate any "clearly established" rights of the Plaintiffs' decedent.

In addressing a defense of qualified immunity, the court must first determine whether the facts, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right of the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If not, the court's inquiry ends. *Id*. Only if the Court concludes that the facts, when viewed in the light most favorable to the plaintiff, make out a constitutional violation, will the court proceed to the second inquiry -- whether the right was "clearly established." *Id*.

In the context of this analysis, a right is "clearly established" only if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). In other words, if an officer could have reasonably believed that his conduct was not a constitutional violation under the circumstances, then qualified immunity must be granted. *Saucier*, 533 U.S. at 200-09. This is so because government officials should not be "expected to predict the future course of constitutional law." *Wilson*, 526 U.S. at 617.

Moreover, a right cannot be considered "clearly established" for the purposes of qualified immunity if the courts disagree about the contours of the right or how it applies in similar circumstances. *Id*. 526 U.S. at 618; *accord McVey v. Stacey*, 157 F.3d 271, 277 (4th Cir. 1998) ("we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues."). Finally, once an official has raised the defense of qualified immunity, the plaintiff bears the burden of demonstrating the existence of a "clearly established" right he claims was violated. *Mitchell v. Rice*, 954 F.2d 187, 190 (4th Cir. 1992).

In this case, in light of the fact that the plaintiffs' decedent was armed and refusing pleas from her grandparents and instructions from law enforcement officers, it certainly cannot be said that Sgt. Rugg violated any "clearly established" rights by attempting to disarm her. In fact, Plaintiffs can cite no case holding it unreasonable to attempt to disarm a subject that releases her hand from a gun. As a result, Sgt. Rugg is entitled to qualified immunity with respect to Plaintiffs' claims against him.

## III.     THE STATE LAW TORT CLAIMS AGAINST SERGEANT RUGG FAIL.

Under North Carolina law (both common law and statutory), a law enforcement officer is privileged to use force--even deadly force--when doing so appears "reasonably necessary" to defend himself from what he reasonably believes to be the use or imminent use of deadly force. *See* N.C. Gen. Stat. § 15A-401(d). Case law from North Carolina's appellate courts recognizes that, within reasonable limits, officers are vested with wide discretion to determine when such force is necessary. *See State v. Anderson*, 40 N.C. App. 318, 321-22, 253 S.E.2d 48 (1979) ("Within reasonable limits, the officer is properly left with the discretion to determine the amount of force required under the circumstances as they appeared to him at the time of the arrest.").

Further, both the Fourth Circuit and other trial courts in this state have held that a finding that an officer's use of force was objectively reasonable under the Fourth Amendment also forecloses liability for state law battery claims. *See, e.g., Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788-89 (4th Cir. 1998) (holding that the same objective reasonableness analysis used for § 1983 claims applied to plaintiff's state law tort claim); *Bell v. Dawson*, 144 F.Supp.2d 454,464 (W.D.N.C. 2001). Accordingly, for the reasons described above in the discussion of the Fourth Amendment excessive force claims, Sergeant Rugg is entitled to judgment as a matter of law with respect to Plaintiffs' state law claims for negligence, assault, battery and wrongful death as well.

16

**IV. SERGEANT RUGG IS ENTITLED TO SUMMARY JUDGMENT ON THE EMOTIONAL DISTRESS CLAIMS.**

To state a claim for negligent infliction of emotional distress, a plaintiffs must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as "mental anguish"), and (3) the conduct did in fact cause the plaintiff severe emotional distress. *Glenn v. Johnson*, 247 N.C. App. 660, 665 (2016).

In this case, Plaintiff's IIED and NIED claims against Sgt. Rugg fail for a very basic reason—they have failed to establish any actionable negligence on his behalf. As explained above, Plaintiffs' common law negligence claims fail because there is no evidence that Sergeant Rugg was unreasonable in attempting to take possession of the gun when Ms. Johnson removed it from her hand. Absent any proof of negligence on the part of the Town, Plaintiff's NIED claim fails. *See Glenn*, 247 N.C. App. at 665.

Finally, Plaintiff's intentional infliction of emotional distress claim against the Defendant Town also fails. To maintain an IIED claim, a plaintiff must prove the following elements: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." *Glenn,* 247 N.C. App. at 668; *accord Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Whether the alleged conduct is sufficiently "extreme and outrageous" to support an IIED claim is a question of law. *See Lenins v. K-Mart Corp*., 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990). Conduct is considered extreme and outrageous only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Briggs v. Rosenthal*, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985).

17

Plaintiffs have failed to establish even ordinary negligence on the part Sergeant Rugg—much less "extreme and outrageous conduct" of the sort required to support liability for IIED. Absent any showing of extreme and outrageous conduct on the part of Sergeant Rugg, the IIED claims must be dismissed. *Glenn*, 247 N.C. App. at 668.

## V. SERGEANT RUGG IS ENTITLED TO PUBLIC OFFICIAL IMMUNITY WITH RESPECT TO THE STATE LAW CLAIMS.

Plaintiff's state law tort claims against Sergeant Rugg are also barred by public officer's immunity because Rugg's use of force was not clearly excessive. "The law of public official's immunity is well established in North Carolina: As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." *Thomson v. Town of Dallas*, 142 N.C.App. 651, 655, 543 S.E.2d 901, 904 (2001) (citations omitted). "Our courts recognize police officers as public officials. Thus, police officers enjoy absolute immunity from personal liability for their discretionary acts done without corruption or malice." *Schlossberg v. Goins*, 141 N.C.App. 436, 446, 540 S.E.2d 49, 56 (2000); s*ee also Jacobs v. Sherard,* 36 N.C. App. 60, 64; 243 S.E.2d 184, 188 (1978); *Jones v. Kearns*, 120 N.C. App. 301, 305; 462 S.E.2d 245, 247 (1995).

Under North Carolina law, the actions of public officials are endowed with a presumption of good faith: "It is well settled that absent evidence to the contrary, it will always be presumed that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law." *Leete v. County of Warren*, 341 N.C. 116, 119, 462 S.E.2d 476, 478 (1995). "This presumption places a heavy burden on the party challenging the validity of public officials' actions to overcome this presumption by competent and substantial evidence." *Id.*

In the present case, there is *no record evidence*—much less "competent and substantial evidence"—to support a finding that Sergeant Rugg's actions were malicious. Any allegations of malice in Plaintiffs' filings are patently insufficient to carry the "heavy burden" of rebutting the presumption of good faith that attaches to his actions.

A claimant must both allege and prove corruption of malice on the part of a public officer engaged in the performance of his duties; absent such proof, the defendant is entitled to summary judgment. *See, Jones*, 120 N.C. App. At 306; 462 S.E.2d at 248; *Hare v Butler*, 99 N.C. App. 693, 700-01; 394 S.E.2d 231, 237 (1990). Plaintiffs have failed to offer any competent evidence to overcome the presumption that Sergeant Rugg acted in good faith, nor can they produce any competent evidence that his actions were "corrupt" or "malicious". In any event, the facts of this case would not support a reasonable finding that Sergeant Rugg acted with malice. "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Thomas v. Sellers*, 142 N.C.App. 310, 313, 542 S.E.2d 283, 286 (2001). The facts here tend to show only that Sergeant Rugg was attempting in good faith to keep the peace and to discharge his duties – duties which both the North Carolina Supreme Court and the Fourth Circuit Court of Appeals have observed were incumbent upon him. *Karadi v. Jenkins*, No. 00-1300, 2001 WL 320893 (4th Cir. April 3, 2001) ("North Carolina law enforcement officers have the duty to keep the peace at all times"); *accord State v. Gaines*, 332 N.C. 461, 472, 421 S.E.2d 569, 574 (1992)(noting that North Carolina's law enforcement officers have a duty to enforce the law at all times). Accordingly, Plaintiff has failed to offer sufficient proof to overcome his defense of public officer's immunity and the claims against him must be dismissed.

**CONCLUSION**

The evidence before this court, even taken in the light most favorable to the Plaintiffs, clearly shows that Sergeant Rugg acted reasonably--there is no evidence suggesting anything other than a good faith to discharge his duties in this matter. For the above-stated reasons, as well as all other evidence in the record, Sergeant Rugg respectively prays the court for an Order granting summary judgment and the dismissal of all claims made against him by the Plaintiffs.

CROSSLEY McINTOSH COLLIER HANLEY & EDES, PLLC

*/s/Clay Allen Collier*
Clay Allen Collier
N.C. State Bar No. 13266
5002 Randall Parkway Ste 200
Wilmington, NC 28403
T: (910) 762-9711
F: (910) 256-0310
clayc@cmclawfirm.com

RYAN LEGAL SERVICES, PLLC

John Edward Ryan, III, Esq.
N.C. State Bar No. 56014
PO Box 569
Mount Olive, NC 28365
john@ryanlegalservice.com

*Attorneys for Sergeant Timothy Rugg*

20

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that Defendant Rugg's Memorandum of Law in Support of Motion for Summary Judgment was filed and served on all parties via the CM/ECF system to counsel of record as set out below:

Carnell Johnson, Esq.
Xavier Torres de Janon, Esq.
Johnson & Nicholson, PLLC
5806 Monroe Rd. Ste 102
Charlotte, NC 28212
xdj@johnnichlaw.com
cj@johnnichlaw.com
*Attorneys for Plaintiffs*

James C. Thornton, Esq.
P.O. Box 27808
Raleigh, North Carolina 27611
jthornton@cshlaw.com

J. Heydt Philbeck, Esq.
P.O. Box 1351
Raleigh, NC 27602-1351
hphilbeck@bdixon.com

*Attorneys for Officer Zacharius Borom*


This the 7th day of July, 2025.


*/s/Clay Allen Collier*
Clay Allen Collier