IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-180-BO-RN

ESTATE OF JADA JOHNSON, )
L.J., the minor daughter of Jada Johnson, )
RICHARD IWANSKI, individually, as )
executor of the Estate of Jada Johnson and )
guardian of L.J., and MARIA IWANSKI, )
individually, as executor of the Estate of )
Jada Johnson and guardian of L.J., )
                                                          )
           Plaintiffs, )                        ORDER
                                                          )
   v. )
                                                          )
SERGEANT TIMOTHY RUGG )
individually, OFFICER ZACHARIUS )
BOROM, individually, and JOHN AND )
JANE DOE'S 1-100, City of Fayetteville )
employees and police officers, )
                                                          )
          Defendants. )

This cause comes before the Court on cross-motions for summary judgment. Plaintiffs moved for partial summary judgment. [DE 78]. Defendants Borom [DE 94] and Rugg [DE 101] have responded. Plaintiffs replied. [DE 108]; [DE 109]. Those parties have filed statements of material facts. [DE 82]; [DE 88]; [DE 97]; [DE 102]. Defendants Borom and Rugg also filed motions for summary judgment. [DE 87]; [DE 96]. Plaintiffs responded to both motions for summary judgment. [DE 113]; [DE 115]. Defendants replied. [DE 118]; [DE 120]. A hearing was held before the undersigned on October 2, 2025. In this posture, the motions are ripe for ruling. For the following reasons, plaintiffs' motion for partial summary judgment is denied, and defendants' motions for summary judgment are granted.

## BACKGROUND

This case arises out of the death of Jada Johnson on July 1, 2022, in Fayetteville, North Carolina. Johnson died after being shot by defendant Zacharius Borom while she was engaged in a physical altercation with defendant Timothy Rugg. Borom and Rugg were police officers with the Fayetteville Police Department. The following factual recitation is derived from the parties' statements of material facts and the defendant police officers' body-camera footage [DE 82]; [DE 88]; [DE 102]; [DE 121, Exhibit E Borom Camera 1; Exhibit F Rugg Camera 1; Exhibit G Borom Camera 2; Exhibit H Rugg Camera 2]. The following facts appear to be undisputed, unless otherwise indicated.

On July 1, 2022, around 10:00 p.m., Fayetteville police officers were dispatched to a residence in response to a report of an attempted home invasion. When Officers Zacharius Borom and Jordon Sori arrived, they met Jada Johnson and her daughter L.J., as well as plaintiffs Richard Iwanski and Maria Iwanski, Johnson's grandparents. Johnson explained to the officers that she had recently broken up with her boyfriend. She believed he was stalking her and meant to harm her and her family. [DE 82, ¶ 8]. Officer Timothy Rugg arrived and listened to the conversation. *Id.* at ¶ 10. As the others spoke, Borom stepped away with Mr. Iwanski to speak privately in the kitchen area.

Borom had responded to a 911 call from the same residence a few days before. Referencing his last experience with Johnson, he asked Mr. Iwanski about her mental health condition. *Id.* at ¶ 12. Mr. Iwanski explained that although Johnson had not been diagnosed, he believed she had paranoid schizophrenia. *Id.* at ¶ 14. She was so frightened of her ex-boyfriend that she suspected the authorities were working for him—she believed "social services, everyone," including the police, were colluding to harm her. *Id.* Mr. Iwanski said he had not seen the ex-boyfriend, and did

2

not opine on whether he posed an immediate threat. However, he noted that the ex-boyfriend was a criminal and that he and his crew would "drive around and keep an eye on" Johnson. [DE 121, Exhibit E Borom Camera 1, 4:20].

Borom responded with concern that Johnson repeatedly called 911 in the absence of an emergency. He warned Mr. Iwanski that if Johnson continued calling, the police would arrest Johnson for abuse of 911. [DE 82 at ¶ 16]. Mr. Iwanski retorted that Johnson made her 911 calls in good faith—Johnson subjectively believed there was an emergency. He contended that during Johnson's last encounter with the police, the police "failed her because they treated her like a criminal, and not like a mentally ill person." *Id.* Borom recommended Mr. and Mrs. Iwanski have Johnson involuntarily committed but said there was little the police could do. *Id.* at ¶ 17.

While Sori recommended that Johnson pursue a restraining order, Rugg and Mr. Iwanski spoke privately in the kitchen area. Mr. Iwanski told Rugg that he didn't believe any attempted break-in had occurred. He checked the motion-sensors and cameras at the back door, where Johnson believed the attempted break-in had occurred, but found no evidence of an attempted invasion. *Id.* at ¶ 27–30. They discussed Johnson's repeated 911 calls, and Mr. Iwanski again took the position that Johnson was mentally ill and made her calls in good faith. *Id.* at ¶ 33.

Rugg returned to the living room and asked Johnson if she had any type of mental health diagnosis. She appeared offended and accused Mr. Iwanski of jeopardizing the family's safety by impugning her credibility on the question of whether she was being stalked. *Id.* at ¶ 41; [DE 121, Exhibit E Borom Camera 1, 20:25]. Rugg explained that she could not keep calling 911 only for officers to respond and find no evidence that the reported incidents had occurred. [DE 82, ¶ 44].

The Fayetteville Police Department has a Crisis Intervention Team (CIT) consisting of certified officers with specialized mental health training. When dispatch perceives a mental health

crisis is ongoing, the police department policy directs dispatchers to send a CIT officer to respond to the call. When a call is not immediately recognizable as a mental health crisis response call, the police officers responding to a mental health situation should determine whether CIT is needed, and if so, request a CIT officer. *Id.* at ¶¶ 3–4; [DE 80-1]. No CIT officer was called to the Iwanski residence on July 1. 2022. [DE 82, ¶ 19].

Although still agitated and combative, Johnson agreed to be re-admitted to the hospital, which she believed would provide her some protection from her stalkers. *Id.* at ¶ 45. Borom called for dispatch of an ambulance and emergency medical services personnel. *Id.* at ¶ 46. No ambulance was immediately available, so its arrival was delayed. *Id.* at ¶ 49. Johnson continued to accuse the officers of working for her ex-boyfriend. Sori, frustrated, abandoned this circular conversation and went outside to wait for the ambulance while Borom and Rugg remained in the house. *Id.* at ¶ 50.

Johnson looked outside and saw a car driving by. Startled, she instructed Mrs. Iwanski to call the police. *Id.* at ¶ 55. Mrs. Iwanski declined, saying, "no, Jada, they're here." When Johnson continued to insist that she call the police, Mrs. Iwanski exclaimed that there were police in the yard. [DE 121, Exhibit F Rugg Camera 2, 16:35]. Rugg raised his voice, telling Johnson that this was the sort of behavior that could get her arrested. "You don't call the police when the police are standing in your living room." [DE 121, Exhibit G Borom Camera 2, 0:14]. At this, Johnson produced a gun hidden in her waistband and raised it to her head, saying, "I'm going to kill myself." *Id.* at 0:45; [DE 82, ¶ 58].

Johnson, gun in hand, asked someone to call the ambulance. Mrs. Iwanski said, "the ambulance is on the way." Johnson replied, "no, they're not, they're lying." She crouched down and briefly laid the gun on the floor next to her. [DE 82, ¶ 64]. Although Rugg stood nearby, he did not have the opportunity to take the gun away, since it was right beside Johnson. *Id.* at ¶ 65.

4

Remaining crouched, Johnson told Mrs. Iwanski to call the "real police." *Id.* at ¶ 66. Mrs. Iwanski went to retrieve Johnson's phone, and Johnson stood up, demanding Mrs. Iwanski bring L.J., her daughter, as well. *Id.* at ¶ 69–70. Mrs. Iwanski brought L.J. and stood holding her next to Johnson. *Id.* at ¶ 72. Borom and Rugg periodically urged Johnson to put down the gun. [DE 88, ¶¶ 34–35].

Johnson called her ex-boyfriend, informing him that the police were there, she was going to die, and she knew he was outside. [DE 82, ¶ 88]. The conversation continued, and she asked him to bring her fentanyl so that she could die without being shot in front of her daughter. *Id.* at ¶ 93. After ending the phone call with the ex-boyfriend, Johnson asked Mr. Iwanski to bring her a bottle of pills. *Id.* at ¶ 94. Mr. Iwanski went to retrieve them, and Johnson adjusted her position standing by the wall. While she moved around, she pointed the gun at Rugg for approximately thirty seconds. *Id.* at ¶ 95. Borom said, "Jada, you've got that pointed at my sergeant." She did not respond, but when Mr. Iwanski returned and handed her a bottle of pills, she tucked the gun under her arm so she could manipulate the pill bottle. *Id.* at ¶ 97. Rugg took this opportunity to lunge for the gun. Johnson and Rugg fell to the floor as they grappled for the weapon. *Id.* at ¶ 98.

Seeing the altercation, Borom approached Johnson and Rugg fighting for the gun on the floor. Borom yelled "shot," and discharged his service weapon seven times, hitting Johnson. *Id.* at ¶ 99. Rugg ducked and recoiled to avoid the line of fire, and Johnson released her gun, which landed on the floor between herself and Rugg. Johnson laid motionless for a matter of seconds, while Rugg and Borom called for medical assistance on their radios. *Id.* at ¶ 102. Rugg began to stand up but lunged again when he saw Johnson move.

After Borom fired the first seven shots and Johnson had dropped the gun on the floor, Rugg's body-camera footage shows Johnson reaching for the gun and wrapping her fingers around

5

the handle of the gun at the trigger area, attempting to gain control of the weapon.[1] Rugg grasped her arm as they continued to fight over the gun. Borom again drew his service weapon and fired nine more rounds at Johnson. While Borom was shooting, Rugg retrieved the gun, this time pulling it away from Johnson. Borom fired his final shots after Rugg had taken the gun in his hand and started to pull it outside Johnson's reach. She was pronounced dead at the scene.

Mr. Iwanski, Mrs. Iwanski, on behalf of Johnson's estate and her daughter L.J., brought this action against the City of Fayetteville, Borom, Rugg, and John & Jane Does 1–100. The claims against defendant City of Fayetteville were dismissed, and the following claims remain: (1) deprivation of rights by use of excessive force under 42 U.S.C. § 1983, (2) wrongful death; (3) survivorship; (4) intentional infliction of emotional distress; (5) negligent infliction of emotional distress; (6) negligent execution of official duties; (7) assault, and; (8) battery.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court

---

[1] The plaintiffs construe this motion as an involuntary jerk, which drew Johnson's hand nearer to the gun by chance. However, because the video clearly shows Johnson contorting her hand in order to wrap her fingers around the handle of the gun at the trigger area, the Court need not adopt plaintiffs' version of this fact. *See Scott v. Harris*, 550 U.S. 372, (2007) (where a videotape of undisputed accuracy has captured the events in question, a court should view the facts in the light depicted by the videotape); *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011) ("[W]hen a video quite clearly contradicts the version of the story told by the plaintiff so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (cleaned up).

views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

## DISCUSSION

### I. Qualified Immunity

The defendants have raised the defense of qualified immunity as to the § 1983 claims against them. Because qualified immunity provides immunity from suit, and therefore a trial, the Court considers this issue first. Qualified immunity shields government officials from liability for statutory or constitutional violations so long as they can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court employs a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis

7

should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). When a court's decision on one step is dispositive, it need not reach the other. *See Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) ("we need not reach both prongs of the analysis," citing *Pearson*, 555 U.S. 223).

Where qualified immunity has been raised, viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff generally means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378; *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *see also Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017) (court must "take the facts in the light most favorable to the plaintiffs to determine the applicable questions of law and ignore any contrary factual claims."). A court "do[es] not make credibility determinations in resolving the first prong of the [qualified immunity] analysis." *Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018). However, a court need not adopt plaintiff's version of a fact when that fact is discredited by a videotape of undisputed authenticity. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007)

To determine whether the defendant officers acted with qualified immunity, the first question is whether the officers violated Johnson's Fourth Amendment rights. Law enforcement officers violate an individual's Fourth Amendment rights when they effect a seizure using excessive force. *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). This standard is objective, and thus without regard to the officer's subjective intention or motivation. *Schultz*, 455 F.3d at 477.

A court does consider, however, the facts and circumstances confronting the officer, and it must focus its attention on the moment the force was employed. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (citations omitted). Specific factors to be considered are the severity of the crime at issue, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to flee. *Graham*, 490 U.S. at 396. Whether the officer's conduct was reasonable is a question of law to be decided after determining "the relevant set of facts and draw[ing] all inferences in favor of the nonmoving party to the extent supportable by the record." *Scott*, 550 U.S. at 381 n.8 (emphasis omitted).

"A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). The focus is on "the totality of the circumstances based on the information available to the Deputy immediately prior to and at the very moment he fired the fatal shots." *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022) (cleaned up, citation omitted); *see also Quinn v. Zerkle*, 111 F.4th 281, 296 (4th Cir. 2024) (court must decide "whether the officer had probable cause to believe that the suspect posed an imminent threat of serious physical harm to anyone at the very moment the deadly force was used.").

Of the *Graham* factors—the severity of the crime at issue, whether the suspect poses an immediate threat, and whether the suspect is actively resisting—all three weigh in defendants' favor. First, Johnson's acts immediately preceding the shooting were severe. Misuse of 911 is a

9

somewhat benign offense, but it is not the one at issue here. The acts giving rise to the shooting were pointing a gun at Officer Rugg and, when Rugg sought to take the gun from her, fighting him aggressively to maintain control of the gun. "No citizen can fairly expect to draw a gun on police without risking tragic consequences." *Lee v. Bevington*, 647 F. App'x 275, 283 (4th Cir. 2016). It is well established that "an officer is entitled to use deadly force when a rifle is pointed directly at him or another officer in his presence." *Quinn*, 111 F.4th at 296.

Second, the defendant officers had probable cause to believe Johnson posed an immediate threat of physical harm to Rugg. If it were not enough that Johnson pointed her gun at Rugg, fought him to retain control of the gun, and then after dropping the gun, reached to regain control of the gun, then a review of Johnson's conduct throughout the evening would support the officers' belief that she posed an immediate threat. Johnson displayed volatile and unstable behavior. She suspected Borom and Rugg were fake police officers working for her ex-boyfriend. [DE 82, ¶ 66]. Further, she explicitly stated that she expected the defendants to kill her that night, and that she wanted to have a shootout. [DE 88, ¶ 25]. While she demonstrated some suicidal ideation, at other times she represented a desire to escape danger, and expressed anger with people whom she believed had endangered her. [DE 82, ¶ 41]. Even if Johnson was not entirely lucid, she had expressed both a tendency for self-preservation and a suspicion that the officers meant to kill her. The officers had probable cause to believe that Johnson, having those beliefs and wielding a firearm, posed an immediate threat.

Third, Johnson was actively resisting. She declined to surrender the gun when Borom and Rugg verbally requested she put the gun down. When Rugg first lunged for the gun, Johnson fought him and they fell to the floor. Even on the floor, Johnson would not capitulate, only releasing the

10
Case 5:23-cv-00180-BO-RN    Document 124    Filed 11/25/25    Page 10 of 15

gun after being shot. A few moments later, when she had collected herself or regained control of her faculties, her first movement was to reach for the gun she had dropped.

Plaintiffs contend that the second round of shots constituted excessive force because the first round of shots "secured" her by extinguishing any threat she posed. "[S]uspects can be secured without handcuffs when they are pinned to the ground, and . . . such suspects cannot be subjected to further force." *Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 668 (4th Cir. 2020). However, Johnson was not secured when Borom fired the second round of shots. She still had access to her gun, reached for it, and had begun to grasp it. At the time Borom fired his second round of nine shots, the officers reasonably perceived Johnson posed a continuing threat.

The fact that Borom fired his last shots after Rugg had gained control of the gun does not render the force excessive. The video shows Borom shooting Johnson as Rugg pulled the gun away from her. The final shots were fired while Rugg had the gun in his hand, and the gun can be seen on the videotape traveling away from Johnson as Borom continued to shoot. The Court recognizes defendants were "forced to make split-second judgments—in circumstances that [were] tense, uncertain, and rapidly evolving—about the amount of force" necessary. *See Graham v. Connor*, 490 U.S. at 396–97. The first round of bullets did not deter Johnson from reaching for her gun. Borom acted reasonably in continuing to shoot during the matter of seconds it took for Rugg to gain complete control of the gun and safeguard it from Johnson. The Eleventh Circuit has described this very circumstance, holding that an officer was "not required to interrupt a volley of bullets until he knew that [the suspect] had been disarmed." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 822 (11th Cir. 2010). *See also McLenagan v. Karnes*, 27 F.3d 1002, 1008 (4th Cir. 1994) (holding a use of force reasonable when the officer had "no time to consider anything at all" except his and the public's immediate safety). It also weighs in defendants' favor that Borom did not empty his

11

gun. The NCSBI forensic team collected an unspent round of bullets from Borom's weapon. [DE 90-3]. This indicates he stopped shooting when he perceived that no imminent threat persisted. [DE 91, p. 22].

In light of the foregoing, the defendant officers had probable cause to believe Johnson posed an imminent threat of serious physical harm to Rugg at the time the deadly force was used, and the use of force was reasonable. Because the officers' use of force did not violate the Fourth Amendment, they acted with qualified immunity. In addition to their qualified immunity defense, the defendants are entitled to judgment as a matter of law because no constitutional violation occurred.

## II. State Law Claims

Plaintiffs brought state law claims against defendants for wrongful death, survivorship, negligent and intentional infliction of emotional distress, negligent execution of official duties, and assault and battery. Defendants contend these state law claims against them fail because they are protected by public official immunity.

Public official immunity precludes certain suits against public officials in their individual capacities. "Police officers engaged in performing their duties are public officials for the purposes of public official immunity." *Lopp v. Anderson*, 251 N.C. App. 161, 168 (2016). "As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." *Wilcox v. City of Asheville*, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012) (citing *Smith v. State*, 289 N.C. 303, 331 (1976)). There is no indication that defendants acted with malice or corruption, so the question is whether they acted within the scope of their authority.

Plaintiffs advocate the theory that the defendant officers acted outside the scope of their authority by failing to call the CIT as soon as they discovered Johnson was having a mental health episode. They argue that this is precisely the scenario for which the crisis intervention team exists, and the Fayetteville Police Department policy imposes a duty on officers to call CIT in order to seek specialized assistance for callers experiencing mental health crises. However, the police department policy gives responding officers the discretion to determine whether CIT is necessary or not. Borom and Rugg recognized Johnson's volatile mental state and responded with tailored suggestions. They urged her family to have her involuntarily committed and urged Johnson to voluntarily commit herself. Indeed, at their suggestion, Johnson agreed to be voluntarily committed, and the officers called her an ambulance. These acts were all directed at obtaining mental health assistance for Johnson. The officers reasonably determined that calling CIT was unnecessary when they had convinced Johnson to be voluntarily committed. Defendants acted within the scope of their authority and are therefore entitled to public official immunity on the state claims asserted against them.

That the officers acted with qualified immunity is further indication that they are immune from the state law claims asserted against them.

> Where the officer defendants are entitled to qualified immunity from plaintiff's federal claims, they are also entitled to public official immunity from plaintiff's state tort claims. Accordingly, defendants' motion for summary judgment is granted as to plaintiff's claims for false imprisonment, intentional infliction of emotional distress, assault and battery, negligent execution of official duties, and trespass under North Carolina law[.]

*Dunlap-Banks v. City of Fayetteville*, No. 5:22-CV-425-FL, 2024 WL 4941306, at *9 (E.D.N.C. Dec. 2, 2024).

Additionally, the state claims fail because the officers' conduct was reasonable. When an excessive force claim under the Fourth Amendment fails because the officer's use of force was

13

reasonable such that he is entitled to qualified immunity, it is "fatal to the Plaintiff's state law tort claims." *See Bell v. Dawson*, 144 F. Supp. 2d, 454, 464 (W.D.N.C. 2001) (citing *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788–89 (4th Cir. 1998) (defendant was entitled to summary judgment on plaintiff's wrongful death claim when officer's actions were reasonable); *Fowler v. Valencourt*, 108 N.C. App. 106, 114, *rev'd in part on other grounds*, 334 N.C. 345 (1993) (officer commits an assault or battery against a citizen only when force was excessive given the circumstances)). *See also Kitchen v. Miller*, No. 1:14-CV-00122-MR-DLH, 2016 WL 7478982, at *9 (W.D.N.C. Dec. 29, 2016) (when officers were entitled to qualified immunity because their use of force was objectively reasonable, their conduct was not negligent nor extreme and outrageous and could not support an infliction of emotional distress or a negligence claim).

## MOTIONS TO SEAL

The parties' statements of material facts and memoranda in support of their summary judgment motions refer to materials the parties have designated as confidential. Therefore, in compliance with the Court's consent protective order of March 31, 2025, the parties have filed them under proposed seal. The Court is not satisfied, however, that the parties' sealing requests are narrowly tailored to overcome the First Amendment or common law presumptions to rights of public access, and the parties have made no arguments on those grounds.

Plaintiffs' motions [DE 83], [DE 110], [DE 116] seek to seal the plaintiffs' statement of material facts [DE 82], exhibits A, B, and D through H of their appendix to their statement of material facts [DE 79], their memorandum in support of their motion for partial summary judgment [DE 81], their reply memoranda in support of their motion for partial summary judgment [DE 108], [DE 109], their objections to the defendants' statements of material facts [DE 111], [DE

14

112], [DE 114], and their response memoranda in opposition to the defendants' motions for summary judgment [DE 113], [DE 115].

Borom's motion [DE 92] seeks to seal Borom's statement of material facts, his memorandum in support of his motion for summary judgment, and his exhibits A (body-worn camera videos), H (Borom deposition), I (Rugg deposition), and O (SBI evidence report). Rugg's motion [DE 104] seeks to seal the same: his statement of material facts, memorandum in support of his motion for summary judgment, and the same exhibits.

The Court finds that sealing the confidential SBI file is appropriate. There is a compelling government interest in keeping confidential law enforcement files private. *See, e.g., Knight Est. of Graham v. City of Fayetteville*, 234 F. Supp. 3d 669, 684 (E.D.N.C. 2017) (maintaining SBI file under seal).

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment [DE 78] is DENIED. Defendants' motions for summary judgment [DE 87], [DE 96] are GRANTED. Plaintiffs' motions to seal [DE 83], [DE 110], [DE 116] are DENIED WITHOUT PREJUDICE. Defendants' motions to seal [DE 92], [DE 104] are GRANTED IN PART as to the SBI file and otherwise DENIED WITHOUT PREJUDICE.

SO ORDERED, this __25__ day of November 2025.

Terrence Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE